UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| TYRUS D. COLEMAN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )       Cause No. 3:16-cv-301 PPS |
| | ) |
| | ) |
| SUPERINTENDENT, | ) |
| | ) |
| Respondent. | ) |

OPINION AND ORDER

Tyrus D. Coleman seeks habeas corpus relief from his conviction for attempted murder. He was found guilty by a jury, and the Elkhart County Circuit Court sentenced him to forty-five years of incarceration. He seeks relief based on a slew of issues, but I find that none of them entitle him to relief.

Let's start with the facts as set forth by the state court which I must presume are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Coleman does not dispute the Indiana Supreme Court's summary of the evidence presented at trial. Here are the facts as set forth by the Indiana Supreme Court:

> In a tragic incident occurring March 18, 2007, Tyrus Coleman shot his friends Anthony Dye and Dye's son Jermaine Jackson during a confrontation on Coleman's property, where Coleman operated a music recording studio. The confrontation stemmed from an event occurring approximately four months earlier in which Omar Sharpe, one of Coleman's musician clients, robbed Dye at gunpoint. Coleman retrieved part of the stolen property from Sharpe and returned it to Dye. Jermaine

1

was irritated when he later learned that Sharpe had robbed his father, but Dye asked him not to get involved. On the afternoon of the shootings, Jermaine discovered that Sharpe was present at Coleman's studio and frantically phoned Dye to "[c]ome over here right now." Armed with a handgun Dye headed to Coleman's studio. In the meantime an armed and agitated Jermaine pushed open the door to the studio and attempted to enter. Sharpe, who was present inside, prevented Jermaine's entry and closed the door. Exiting the studio Coleman attempted to calm Jermaine and to dissuade him from trying to enter. Coleman called a neighbor to come over to help calm Jermaine; he also called his business partner to inform him of the situation. The neighbor testified that he tried to talk with Jermaine by telling him what he [Jermaine] was doing "wasn't worth it. Just go ahead and leave. There was kids around and people around that didn't have nothing to do with what they was angry about." According to the witness Jermaine responded by saying, "F* *k that. He didn't think about that s* *t when he did the s* *t to my Daddy." Coleman armed himself and walked back and forth in front of the studio door holding his handgun at his side. As Coleman was making a phone call, Dye came into the yard through a front gate carrying a handgun which was pointed toward the ground. Dye strode toward his son Jermaine, who was standing next to Coleman on the patio in front of the studio. Within three seconds, the following occurred: Dye stepped onto the patio where Jermaine and Coleman were standing. As Dye stepped in front of Coleman, Coleman raised his gun and fired at Dye, who immediately fell to the ground. Coleman then shot Dye a second time. At that point Coleman "turned to Jermaine." Coleman saw that Jermaine's handgun, which before that time had been concealed under his shirt and in a holster, was "pointed at [Coleman]," and Coleman shot Jermaine. Jermaine fell to the ground and died at the scene as a result of his injuries. After the shooting, Coleman drove to Milwaukee disposing of his weapon along the way. Several days later he returned to Elkhart and surrendered to the police.

*Coleman v. State*, 946 N.E.2d 1160, 1163-64 (Ind. 2011); ECF 7-11 at 2-3.

What is not included in the Supreme Court's description of the evidence is the fact that the entire episode is captured on video which I have viewed in my consideration of Coleman's petition. State's Exhibit 25 is a DVD from a security video from the day in

question — March 18, 2007. The shootings occurred at approximately 3:34 pm. The Supreme Court's description of the events is accurate. But a picture is worth a thousand words, and I found viewing the video to be extremely helpful in bringing the case into focus.

The State charged Coleman with murder for the death of Jermaine Jackson and attempted murder for the shooting of Mr. Dye. In the first trial, Coleman testified and admitted the shootings, but contended that his actions against both victims were justified on the basis of self-defense. The jury acquitted Coleman on the murder of Jackson, but was hung on the charge of attempted murder of Mr. Dye. Recall that Dye was shot twice and survived, and Jackson was shot thereafter and died. The trial court thus declared a mistrial on the count of attempted murder of Mr. Dye and scheduled another trial. Prior to retrial Coleman filed a motion to dismiss contending a subsequent trial on the attempted murder of Dye was barred by collateral estoppel and the Double Jeopardy Clauses of both the United States and Indiana Constitutions. The trial court denied the motion, and a retrial ensued where Coleman was found guilty of the attempted murder of Dye. He was later sentenced to a term of forty-five years. *Id.* at 1164.

Coleman argues that he is entitled to habeas corpus relief because his second trial on the charge of attempted murder violated the Double Jeopardy Clause. He also argues that he was denied effective assistance of trial counsel when trial counsel: (1) failed to question the jurors regarding self defense during voir dire; (2) failed to properly cross-examine Dye's testimony; (3) failed to comply with a witness separation order and call

character witnesses; (4) failed to call Omar Sharpe and LaQuisha Hunt as witnesses; (5) failed to present an uncropped version of the video recording of the shooting; and (6) presented inconsistent defenses. Coleman has presented these claims to the Indiana Supreme Court and the Court of Appeals of Indiana. ECF 7-3 at 16-27; ECF 7-10; ECF 7-14; ECF 7-18. Therefore, Coleman has properly exhausted his State court remedies, and I will consider his claims on the merits. *See* 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004).

Respondent argues that Coleman's petition is untimely because he missed the limitations deadline of May 10, 2016, by six days. Respondent concedes that the prison mailbox rule may apply but notes that Coleman did not corroborate his assertion that he timely submitted the petition to the prison mail system with an affidavit. *See Ray v. Clements*, 700 F.3d 993, 1008 (7th Cir. 2012). However, Coleman has since filed an affidavit attesting that he submitted the petition to the prison mail system on May 6, 2016. ECF 10-1. As a result, I find that Coleman's petition is timely.

## Discussion

Federal habeas review serves as an important error-correction role in helping to ensure the proper functioning of the criminal justice system. But the available relief is very limited. "Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted). Habeas relief can only be granted in one of two ways: if it is shown that the adjudication

of the claim by the state court resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if the state court decision was based "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

This is a demanding standard that has been described by the Supreme Court as being "intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings . . . of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods*, 135 S. Ct. at 1376 (quotation marks and citations omitted). What this means is that to succeed on a habeas claim the petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

With these standards in mind I will turn to the various claims for relief asserted by Mr. Coleman.

**Issue Preclusion and Double Jeopardy**

Coleman claims that the Indiana Supreme Court made an objectively unreasonable determination that his second trial on the charge of attempted murder did not violate the Double Jeopardy Clause. On direct appeal, Coleman argued that issue preclusion applied to the charge of attempted murder of Dye barring a retrial on that count. Coleman's theory is that because the jury acquitted him of the murder of Jackson, that amounted to a finding of fact that he acted in self-defense as to the other victim, Dye.

Let's start with some basics. The Double Jeopardy Clause of the Fifth Amendment "was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." *Green v. United States*, 355 U.S. 184, 187 (1957). The doctrine of issue preclusion "is embodied in the Fifth Amendment guarantee against double jeopardy." *Ashe v. Swenson*, 397 U.S. 436, 445 (1970). This means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443. "Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.* But

consideration of counts upon which the jury hung "has no place in the issue-preclusion analysis." *Yeager v. United States*, 557 U.S. 110, 122 (2009). "Because a jury speaks only through its verdict, its failure to reach a verdict cannot—by negative implication—yield a piece of information that helps put together the trial puzzle." *Id.* at 121.

At the first trial, the prosecution attempted to prove a charge of attempted murder for the shooting of Dye and a charge of murder for the shooting of Jackson. Direct Appeal App. 104. Recall that Coleman shot Dye twice, and then, immediately thereafter, Jackson pointed a gun at Coleman, and Coleman shot and killed Jackson. Coleman asserted self-defense, and the jury was instructed on this defense. *Id.* at 112. The jury acquitted Coleman on the charge of murder of Jackson, but it could not reach a verdict on the charge of attempted murder of Dye. *Id.* at 130. Coleman then filed a motion to dismiss the charge of attempted murder based on issue preclusion, which the trial court denied. *Id.* at 147-66, 184-88. At the second trial, the jury convicted Coleman on the charge of attempted murder. *Id.* at 317.

Here's how the jury was instructed on self-defense:

> A person is justified in using deadly force, and does not have a duty to retreat, only if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself or a third person or the commission of a forcible felony.

> However, a person may not use force if:

> He is committing a crime that is directly and immediately connected to the confrontation;

He provokes a fight with another person with intent to cause bodily injury to that person; or

He has willingly entered into a fight with another person or started the fight, unless he withdraws from the fight and communicates to the other person his intent to withdraw and the other person nevertheless continues or threatens to continue the fight.

*Id.* at 112.

On direct appeal, Coleman argued that the jury from the first trial acquitted him on the charge for the murder of Jackson based on the self-defense instruction, although this is rank speculation. ECF 7-3 at 18-22. He further argued that this means that this jury necessarily found that he did not commit a crime by shooting Dye, which took place before he shot Jackson. *Id.* To which I ask, why then did the jury not acquit him of the attempted murder? The respondent argued on direct appeal that the jury could have interpreted the two shootings as a single confrontation and then considered whether Coleman had committed a crime prior to this confrontation. ECF 7-4 at 23-27. The Court of Appeals of Indiana agreed with Coleman and reversed the trial court's ruling on the motion to dismiss. ECF 7-6.

Respondent petitioned the Indiana Supreme Court for transfer, which was granted. ECF 7-9. According to the Indiana Supreme Court, Coleman argued that if the jury found that he was reasonably in fear of Jackson, then the jury must have necessarily found that he was reasonably in fear of Dye. ECF 7-11 at 4-6. The Indiana Supreme Court rejected this argument, noting that the jury could have sensibly found that the second shooting was

justified but that the first shooting was not because Jackson, unlike Dye, was clearly agitated and had pointed and fired a gun at Coleman. *Id.*

Significantly, the Indiana Supreme Court's reasoning, though internally sound, wholly misconstrues Coleman's argument and omits any mention of the reasoning of the Court of Appeals of Indiana. Indeed, Coleman's argument regarding issue preclusion remained consistent at each relevant stage of litigation from his motion to dismiss to the instant habeas petition, and there is no apparent explanation as to why the Indiana Supreme Court declined to address it. This discrepancy raises the question of which standard of review I should apply to the Indiana Supreme Court's decision.

In *Harrington v. Richter*, 562 U.S. 86, 98 (2011), the Supreme Court held that, "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." In such cases, "a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 102. The Supreme Court extended the *Harrington* standard of review to "when the state court addresses some of the claims raised by a defendant but not a claim that is later raised in a federal habeas proceeding." *Johnson v. Williams*, 568 U.S. 289, 293 (2013).

Similarly, the Seventh Circuit extended the *Harrington* standard of review to cases in which "the last state court to render a decision offers a bad reason for its decision." *Brady*

*v. Pfister*, 711 F.3d 818, 826 (7th Cir. 2013). In such cases, federal courts must "still apply AEDPA deference to the *judgment*." *Whatley v. Zatecky*, 833 F.3d 762, 775 (7th Cir. 2016). Stated otherwise, a federal habeas petitioner is not entitled "to de novo review simply because the state court's rationale is unsound." *Id.* Based on these cases, I conclude that I must apply the deferential standard of review described in *Harrington* to the judgment of the Indiana Supreme Court even if the opinion of the Court did not address the substance of Coleman's argument.

After reviewing the record, there is at least one theory that could have supported the Indiana Supreme Court's decision. The trial court denied Coleman's motion to dismiss because the jury did not necessarily rely on the self defense instruction to acquit Coleman; they could have acquitted Coleman of the Jackson murder by finding that the prosecution did not demonstrate the elements of the offense of murder. Direct Appeal App. 187. Coleman tells me that the fact that he knowingly killed Jackson was not in dispute, but the trial record suggests otherwise. The jury was instructed that to convict Coleman for murder, they were required to find that he knowingly killed Jackson and that knowingly was defined as follows: A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so. *Id.* at 105,109. Coleman did not concede this element at trial, but instead testified as follows:

> **Trial Counsel:** Now, you just have explained that you have this history with [Jackson]. You're–you're good friends. Long time. You know he's not that type of person. What's happening here?

**Coleman:** I don't know what's happening. I don't–I don't know. Everything just went so fast. Every went so crazy fast. It went from being cool and everything calming down, to right back there in a split second. I just seen–and I didn't expect it from him at all. I never been in a situation like this before in my life.

**Trial Counsel:** Why did you turn your gun to [Jackson]?

**Coleman:** Because the gun was pointed at me.

**Trial Counsel:** Did [Jackson] shoot first or did you shoot first?

**Coleman:** I think–well, I would probably say he shot first at me 'cause as soon as I moved and started like I was going to turn towards him, that's when his gun started going off, and then I instantly returned fire.

**Trial Counsel:** Did the whole thing–did the whole shooting started when you fired at [Dye]?

**Coleman:** Yes, sir.

**Trial Counsel:** Up till that point, [Jackson's] gun was actually in the holster?

**Coleman:** Yeah. I–I–I believe when he seen me raise the gun at [Dye], I believe that's when he first started to pull his gun out; but, I mean, I'm not for sure of that because my focus was on [Dye]. I wasn't really too much worried about him until I looked over at him. But everything happened so fast. Everything–I mean, it was all over with within like three seconds.

First Trial Tr. at 299-301.

What's more, using this testimony for support, trial counsel invited the jury to acquit Coleman of the murder charge based on the prosecution's failure to prove beyond a reasonable doubt that Coleman had formed the requisite *mens rea* when he fatally shot Jackson. Here's what trial counsel said on that subject during closing argument:

Now, the prosecutor is going to go through each element, or did go through each element of, okay, what is murder and what is attempted murder and

what does the prosecutor have to prove, and he has to prove each one of those things beyond a reasonable doubt. You have to be firmly convinced in the matter of the highest important to you that [Coleman] committed this crime. Think about the state of mind.

The prosecutor talks a lot about how do we know, how do we know that's going on in a person's mind? We look at all the actions before, during, and after. We look at the whole context. We look at the totality of the circumstances. All the shooting lasted three seconds. It's clear that [Coleman] was afraid. It's clear that [Coleman] was irrational after the fact. So did he really know he was killing [Jackson]; did he really have the specific intent to kill [Dye]; or was it something else? Was it acting without thinking? Acting without thinking. Does that make any sense? Anybody ever done that?

Let me give you an example. Somebody tries to punch you in the face and you duck. Do you think, well, I'm getting ready to get punched in the face I better duck, or do you just duck? You can act without thinking. Because of the situation he was in, because there were two armed men coming at him, one of them a scary guy, two armed men who made it known we're here to hurt somebody don't get in our way or you'll get it too, in an instant he reacted. In an instant he stopped [Dye]. [Dye] approaching aggressively, gun in hand, ready to be fired, and [Coleman] stopped him. That's what was in his mind. That was his intent. You can't say anything more than that. You can't be sure beyond a reasonable doubt of anything more than that.

*Id.* at 396-97. Following this line of argument, it is altogether possible that the jury could have based it acquittal of Coleman on the lack of proof beyond a reasonable doubt that Coleman acted "knowingly" and that the acquittal had nothing to do with self-defense.

Let's be honest about it: we really do not know why the first jury acquitted Coleman of the murder charge and ended up hung on the attempted murder count. But if one were to accept Coleman's argument, the Double Jeopardy Clause would preclude retrial on the hung count. I see no basis in law or fact why that would be the case. The simple fact of the matter is that the State of Indiana was free to retry Coleman on the attempted murder

count because the first jury was hung on that charge. This is because, as stated above, "a rational jury could have grounded its" acquittal of Coleman in the Jackson murder "on an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 397 U.S. at 443. In other words, the jury could have grounded its acquittal of Coleman on something other than self-defense. So nothing about the retrial on the hung count offends the Double Jeopardy Clause.

**Ineffective Assistance of Counsel**

Coleman alleges that trial counsel from his second trial provided constitutionally ineffective assistance of counsel. To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland* . . . ." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

Coleman generally argues that the Court of the Appeals of Indiana was misguided on how to apply the prejudice prong of the *Strickland* analysis by the Indiana Supreme

Court's decision in *Helton v. State*, 907 N.E.2d 1020 (Ind. 2009). In a footnote in *Helton*, the Indiana Supreme Court cited an incorrect articulation of the *Strickland* prejudice test merely to reject it. *Id.* at 1023 n.1. Though the Court of Appeals of Indiana cited *Helton* as it set forth the *Strickland* analysis, there is no indication that the Court of Appeals of Indiana relied on this incorrect standard when deciding Coleman's case. Therefore, Coleman's argument that Court of Appeals of Indiana was misguided by *Helton* is not a basis for habeas relief.

Coleman has a number of specific claims of ineffective assistance of counsel which I will address below. But first, Coleman claims that the state habeas court's description of the video of the crime was an unreasonable determination of the facts in light of the evidence presented during the state court proceedings. I'll take that issue up first before moving on to the specific claims of ineffective assistance of counsel.

### 1.    Summary of the Video Recording

At the post-conviction relief stage, the State courts considered the video recording of the shootings as they assessed Coleman's ineffective assistance of counsel claims. Coleman takes issue with the State courts' summary of the video recording:

> The video taped recording of the actual shooting herein . . . shows Dye entering the backyard until he is twice shot by Coleman; Dye has his gun to his side, and is walking in the direction of and looking at his son, [Jackson]. Coleman appears from the shadow and from the side and behind Dye, and as Dye walks past [Coleman] with his gun down, Coleman raised his own gun and shoots Dye in the back of his head behind his ear. As Dye falls to the ground, Coleman shoots him again. It is not until this separate and distinct crime occurs that Dye's son [Jackson] pulls his weapon and shoots at Coleman. The evidence presented at trial was also that after the shooting,

[Coleman] paced in the backyard, had a cell phone but did not call emergency personnel or law enforcement, but rather fled with his weapon, later throwing the gun into a body of water and left the state.

ECF 7-17 at 7-8.

Coleman argues that this fact summary: (1) wrongfully implies that Coleman shot Dye for the second time after he fell to the ground but he fired this shot when Dye was standing; (2) wrongfully states that Coleman appeared from a shadow but Dye had full vision of Coleman from the moment he entered the backyard; and (3) wrongfully states that Coleman appeared from behind Dye and that he shot Dye in the back of the head as Dye walked past Coleman. I have reviewed the video recording. The first two statements accurately characterize the events even if they could have been more precise and, perhaps, more fairly phrased. I agree with Coleman that the third statement is inaccurate but not to an unreasonable degree when considering the perspective of the surveillance camera and that Dye seemingly intended to walk past Coleman and was only one or two steps from doing so. Accordingly, I cannot conclude that the Court of Appeals of Indiana based its decision on an unreasonable determination of the facts in light of the evidence presented during the State court proceedings.

2. __Counsel's Performance During Voir Dire__

Coleman argues that his trial counsel was ineffective when he failed to question the jurors in voir dire about their views on self defense. The Court of Appeals of Indiana found that Coleman did not show deficient performance because the prosecution asked the jurors about their ability to assess the self defense issue and trial counsel chose to focus on studying the jurors as they responded to the prosecution's questions. ECF 7-17 at 9-11. The appellate court also found that Coleman did not demonstrate that he was prejudiced by trial counsel's voir dire strategy. *Id.*

After reviewing the record, I find that the appellate court's determination regarding trial counsel's failure to question the jurors in voir dire was not objectively unreasonable. During voir dire, trial counsel stated that he had no questions for the jurors due to the prosecution's thorough line of questioning, which suggests a strategic decision. Voir Dire Tr. 72. Additionally, regarding the prejudice prong, Coleman offers no evidence to show that more voir dire questioning would have changed the outcome of the trial but merely speculates that the jurors may not have believed in self defense. Because the appellate court's determination was not unreasonable, the claim that trial counsel was ineffective for failing to question jurors regarding self defense is not a basis for habeas relief.

**3.** **Cross Examination of Dye**

Coleman argues that trial counsel was ineffective for failing to impeach Dye with inconsistent testimony from the first trial and pending charges and failing to question Dye regarding his gun. The first inconsistency highlighted by Coleman is that, at the first trial, Dye testified that, prior to the shootings, he might have asked Jackson about Omar Sharpe's location, but, at the second trial, he testified that he did not say anything. First Trial Tr.135-36; Second Trial Tr. 156. Coleman also notes the following inconsistency in the testimony regarding Coleman's involvement in the prior robbery of Dye. At the first trial here's what Dye said:

> **Trial Counsel:** And you didn't – you knew that [Coleman] wasn't involved in this robbery?
>
> **Dye:** Well, I protected him to the end. Anytime somebody would ask me I would always say no. [Coleman] ain't have nothing to do with it. That was my take on it.

And then at the second trial, here's what he said:

**Trial Counsel:** Okay. You knew Tyrus didn't have anything to do with the robbery, right, the – Omar's robbery of you?

**Dye:** At first. I mean, when it first happened, you know, I gave him the benefit of the doubt, you know. Everybody else, though, kept putting him in it, but I protected him til the end.

First Trial Tr. 151; Second Trial Tr. 160. In my view, these are trifling discrepancies in Dye's testimony. Trial counsel may have felt that pointing out such modest inconsistencies would have been silly and nitpicky. That's a judgment call.

The Court of Appeals' determined that counsels' failure to impeach did not result in prejudice under *Strickland*; that decision was entirely reasonable. After reviewing the record, I find that the State court's determination regarding trial counsel's failure to impeach Dye was not objectively unreasonable. Coleman argues that the failure to impeach prejudiced him because the prosecution's case primarily relied on Dye's testimony and the video recording, which meant that Dye's credibility was pivotal to the jury's decision. Coleman does not further elaborate on this argument, and it is not clear that Dye's credibility was a material consideration by the jury. The entire episode was captured on video for the jury to review. In all likelihood, the video is what made the case. In any event, Coleman has not cited any portion of Dye's testimony that substantially undermined his defense.

Coleman also argues that trial counsel was ineffective for failing to ask Dye whether his gun was loaded. The appellate court rejected this claim, reasoning that whether the gun was loaded was irrelevant because Coleman had no knowledge regarding this detail. ECF 7-17 at 13. In other words, whether the gun was loaded or not was neither here nor there because there was no way for Coleman to have known this, and that is the only person that matters. The court concluded that asking this question would not have changed the outcome of the proceedings, and therefore there is no prejudice under *Strickland*. This conclusion is entirely reasonable.

### 4.    Counsel's Handling of Character Witnesses

Coleman argues that trial counsel was ineffective because trial counsel intended to call three character witnesses at trial who would have testified regarding Coleman's reputation for truthfulness but were excluded due to trial counsel's failure to advise them of a separation order. The appellate court rejected this claim based on lack of prejudice, citing Indiana Rule of Evidence 608 and reasoning that character testimony would not have been admissible because the prosecution did not attack Coleman's character for truthfulness. ECF 7-17 at 14-15.

Though Coleman argues that the prosecution did attack his character for truthfulness, I find that the appellate court's finding of no prejudice was not objectively unreasonable. As discussed by the appellate court, the trial transcript shows that trial counsel had decided to call only one character witness, Thomas Rogers. Second Trial Tr. 453-54. The trial court excluded Rogers' testimony because he violated the separation order but also because Rogers did not have sufficient knowledge regarding Coleman's reputation in the community. *Id.* at 470-76. Therefore, Rogers' testimony would have been excluded anyway, even if trial counsel had properly advised Rogers of the separation order. In any event, in the face of compelling video evidence of the shooting, it is difficult to see how character witnesses would have made any difference in this case. Because the appellate court's determination was not unreasonable, the claim regarding trial counsel's failure to introduce character testimony is not a basis for habeas relief.

**5.**     **Counsel's Failure to Call Witnesses Omar Sharpe and LaQuisha Hunt**

Coleman argues that trial counsel was ineffective by failing to call Omar Sharpe and LaQuisha Hunt as witnesses. He argues that Sharpe's testimony would have established that Coleman was not involved in the robbery of Omar Sharpe four months prior to the incident for which Coleman was on trial. He further claims that Sharpe would have testified that Jackson was aggressive and enraged. The appellate court found that trial counsel did not perform deficiently because trial counsel had no reason to anticipate that the prosecution would suggest that Coleman was involved in the robbery. ECF 7-17 at 15-17.

Coleman takes issue with the State court's characterization of the decision not to call Sharpe as strategic, pointing to trial counsel's testimony during the post-conviction relief stage. There, trial counsel testified that, on the third day of the trial, he hastily had Sharpe returned to custody because he was discouraged by what had happened at trial. PCR Tr. 65-69. It is questionable whether trial counsel's handling of Sharpe was deficient performance or not. But there was no prejudice in any event. As the respondent argued on appeal at the post-conviction relief stage, (1) the value of Sharpe's testimony was to bolster Coleman's testimony that he did not participate in the robbery of Dye; (2) Sharpe's testimony could have prejudiced Coleman's case by contradicting Coleman's testimony and placing even more focus on the robbery instead of the shooting; and (3) in any event, the prosecution only briefly implied during closing argument that Coleman might have participated in the robbery. ECF 7-15 at 30-33. Considered together, and in the face of

strong evidence of Coleman's guilt in the form of video evidence, it is doubtful that Sharpe's testimony would have changed the outcome of the trial.

Coleman argues that LaQuisha Hunt's testimony would have corroborated his testimony about a threatening telephone call he received from Dye. The appellate court denied this claim based on lack of prejudice, describing Hunt's testimony during the post-conviction evidentiary hearing as fabricated and imprecise. ECF 7-17 at 15-17. Coleman responds that Hunt's credibility was not challenged when she testified at his first trial. On cross-examination at the evidentiary hearing, the respondent questioned Hunt on how she was able to identify Dye's voice, and she admitted that she had never met him or heard his voice before that telephone call. PCR Tr. 246-50. By contrast, at the first trial, the prosecution did not meaningfully challenge Hunt's testimony. Hunt Tr. 1-5. Though this contrast demonstrates that the prosecution could have chosen not to challenge Hunt's testimony, it does not demonstrate that the State court's assessment of the testimony or its determination regarding lack of prejudice was unreasonable. Therefore, the claim that trial counsel was ineffective by failing to call Omar Sharpe and LaQuisha Hunt as witnesses is not a basis for habeas relief.

**6.      Presentation of the Video Recording**

Coleman argues that trial counsel was ineffective for showing at trial a cropped version of the video recording that did not show Jackson drawing and firing his gun. He argues that this prejudiced him by allowing the jury to infer that Coleman attacked Jackson without provocation. The Court of Appeals of Indiana found no prejudice because two

eyewitnesses testified that Jackson was armed. ECF 7-17 at 19. Coleman responds that an uncropped version of the video would have irrefutably demonstrated that his conduct toward Jackson was an act of self defense.

At trial, Coleman and another witness testified that Jackson had a gun and was acting erratically at the recording studio; a detective testified regarding the location of the bullet holes; and the video recording showed the relative positions of Coleman and Jackson. Second Trial Tr. 86, 310-11, 374-77. From this evidence, a jury could have deduced that Jackson drew and fired his gun. Moreover, though trial counsel presented the cropped version of the video recording as a result of a lack of familiarity with the courtroom technology, he later considered presenting additional evidence to show Jackson's conduct. *Id.* at 447-53. However, after discussing the potential negative consequences of focusing on Jackson's conduct with the trial court, trial counsel consulted with Coleman and declined the opportunity. *Id.* Therefore, trial counsel made a strategic decision not to present additional evidence, which suggests that he did not perform deficiently in that respect. The appellate court's decision was thus not unreasonable, and the claim that trial counsel was ineffective for showing at trial a cropped version of the video recording that did not show Jackson drawing and firing his gun is not a basis for habeas relief.

### 7. **Inconsistent Defense Theories**

Coleman argues that trial counsel was ineffective for arguing at closing that Coleman had no intent to kill *and* that he acted in self defense. He says these are inconsistent theories and arguing inconsistent theories to a jury is not a wise thing to do.

This argument is a bit perplexing because it is not at all clear that the two arguments are even inconsistent. It is plausible that an individual could shoot at another individual with the intent of defending himself without the intent to kill. Indeed, Coleman testified that this is precisely what happened:

> **Trial Counsel:** [Coleman], was your intent when you fired at [Dye] to end his life?
>
> **Coleman:** No. No. 'Cause if I wanted him dead I could have shot–
>
> **Prosecution:** Objection. Calls for narrative.
>
> **The Court:** I'm sorry.
>
> **Prosecution:** I said objection. Call for narrative.
>
> **The Court:** Rephrase your question.
>
> **Trial Counsel:** Was your intent when you fired at [Dye] to end his life?
>
> **The Court:** That's the same question. Rephrase it.
>
> **Trial Counsel:** What was your intent, [Coleman], when you fired at [Dye]?
>
> **Coleman:** To get the gun out of his hands.
>
> **Trial Counsel:** What was your belief as far as the threat that [Dye] post at the time you fired your gun at [Dye]?
>
> **Coleman:** I felt he was coming to shoot Omar, me too.

Second Trial Tr. 401-02.

Additionally, it is plausible that an individual reacted in self defense without enough time for any intent to develop. This theory is reflected in trial counsel's closing arguments. *Id.* at 525-26. Further, during the first stage of closing arguments, the

prosecution focused solely on the elements of murder, which further suggests that trial counsel's decision to respond to the prosecution was sound even assuming that the self-defense theory was more likely to succeed than arguing lack of intent to kill. *Id.* at 497-515. The Court of Appeals of Indiana found that trial counsel made a strategic decision to make these arguments and did not perform deficiently. ECF 7-17 at 19-20. Based on the foregoing, that decision was not an unreasonable one.

8. **Cumulative Errors**

Coleman argues that even if no individual error was sufficiently prejudicial to merit habeas corpus relief, the court should grant him relief based on the cumulative prejudice of all of the errors combined. The Court of Appeals of Indiana found that the cumulative effect of trial counsel's errors did not deprive Coleman of his right to effective assistance of counsel. ECF 7-17 at 24. "[P]rejudice may be based on the cumulative effect of multiple errors. Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient." *Malone v. Walls*, 538 F.3d 744 (7th Cir. 2008).

After reviewing the record and considering Coleman's claims of ineffective assistance claims, I cannot find that the State court's determination regarding cumulative error was objectively unreasonable. Trial counsel arguably performed deficiently and Coleman arguably suffered some prejudice from the cross-examination of Dye, the failure to call Sharpe and Hunt, and the presentation of the cropped version of the video recording. However, at trial, the parties presented a substantial amount of evidence

consisting of testimony from eight prosecution witnesses, including Dye; testimony from seven defense witnesses, including Coleman; photographs; and a video recording, which shows Coleman shooting Dye. After weighing the evidence presented at trial against the cumulative effect of these errors, I cannot conclude that these errors are sufficient to undermine the outcome of the trial. Based on the foregoing, the claim regarding cumulative error is not basis for habeas relief.

* * *

Pursuant to Section 2254 Habeas Corpus Rule 11, I must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this opinion for denying habeas corpus relief, there is no basis for encouraging Coleman to proceed further. For the same reasons, he may not appeal *in forma pauperis* because an appeal could not be taken in good faith.

Accordingly, the court **DENIES** the habeas corpus petition; **DENIES** a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; **DENIES** leave to appeal *in forma pauperis* pursuant to 28 U.S.C. § 1915(a)(3); and **DIRECTS** the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED.

ENTERED: May 7, 2018.

/s/ Philip P. Simon
_____
Judge
United States District Court